IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

MARK E. FRONTERA,

      Plaintiff,

                                 Case No. C2-06-1046
vs.                             Judge Edmund A. Sargus, Jr.
                                 Magistrate Judge Norah McCann King

CITY OF COLUMBUS,
      et al.,

      Defendants.

## OPINION AND ORDER

This matter is before the Court for consideration of Defendants' Motion for Summary

Judgment. For the reasons that follow, Defendants' Motion is **GRANTED**.

## I.

Plaintiff, Mark E. Frontera, is a current employee of the City of Columbus Division of

Police where he has served as a police officer for over eleven years. Following the Court's earlier

ruling on Defendants' motion for judgment on the pleadings, Plaintiff's remaining claims arise

under 42 U.S.C. § 1983 for alleged violations of his First and Fourteenth Amendment rights

against the City of Columbus as a municipality and City employees Robert Meader, Kimberly

Jacobs, Joseph Bachman, Mark Rapp, William Mattei, Kerry Hile, David Ross, Stephen P.

Gammill, Roderick Wittich and Ronald Gray in their official capacities only.[1] The following facts

---

[1]     In his Memorandum in Opposition to Defendants' Motion for Summary Judgment,
Plaintiff provides a brief section, albeit without citation to any case law, dedicated to his assertion that
Defendants violated his rights under the Fourth Amendment. Plaintiff, however, did not plead a Fourth
Amendment claim in his Amended Complaint. In any event, as set forth below, the facts of this case do

underlie his claims.

Beginning in 1998, Plaintiff volunteered "as a private citizen on his personal time," with Exploring. (Amend. Compl., ¶ 16; Mem. Opp., at p 1.) Exploring is a career-education program operated and maintained by Learning for Life, a non-profit subsidiary of the Boy Scouts of America. Local community organizations initiate a specific Explorer post by matching people and program resources to the interests of the youth in the community.

The Columbus Division of Police is a sponsoring organization for the law-enforcement career-education program at Explorer Posts #221 and #222. The Columbus Division of Police provides the Explorers with uniforms and equipment.[2] The Explorers from Posts #221 and #222 typically meet at either the Columbus Police Training Academy or the Division Headquarters. (Jackson, J. Aff., ¶ 5.)[3]

Employees of the Columbus Division of Police volunteer as advisor-leaders at Explorer Posts #221 and #222. Plaintiff was the Post Advisor for Post #222. Either the Boy Scouts or the sponsoring organization determine who may serve as the adult volunteer and may remove such person from the program at any time with or without cause. (Green Aff., ¶ 4.)[4] To be a Post

not give rise to such a claim.

[2]    The Columbus Police Explorers provide training to the youth members in such activities as police radio codes, crime scene search and investigation, bomb threat response, building searches, arrest and search techniques, accident investigation, domestic crisis intervention, hostage negotiation, and traffic stops. Explorers have assisted the Police Division at events such as graduations and promotional ceremonies. Explorers also participate in the ride along program with Columbus police officers. Every two years, Explorers from around the country compete at a national conference to showcase their training in these police-related activities. (Jackson, J. Aff., ¶ 3-4.)

[3]    Jason Jackson has been employed as a police officer with the City of Columbus for approximately fourteen years. He is currently the Post Advisor for Post #221. (Jackson, J. Aff., at 2.)

[4]    Mr. Green is employed as the Scout Executive for the Boy Scouts of America, Simon Kenton Council. In that position, Mr. Green is responsible for the selection, approval and maintenance

Advisor, the adult-volunteer leader must be a police officer.[5] Historically, the Columbus Division of Police Explorers have reported through the Division's Training Bureau. In 2004, Lieutenant Robert Meader had authority over the administrative operations of the Explorer Posts by virtue of his position within the Training Bureau.

As part of its established policies, Learning for Life prohibits "one-on-one" contact between adult leaders and the youth members. Except for certified "ride-alongs" with a police officer, additional Explorers or advisors must be present during Explorer-adult interactions. (Green Aff., ¶ 3.)

While he was serving a the Post Advisor, Plaintiff had an Explorer from his Post, Jason, spend the night at his home prior to a national Explorer competition in Atlanta, Georgia.[6] Plaintiff asserts that Jason was eighteen years old at the time. Although Plaintiff acknowledges the Explorer program's prohibition against one-on-one contact, he interprets this proscription as limited to participants under the age of eighteen.[7]

On December 13, 2004, Officer Kimberly Wilkinson, who volunteered as an Assistant Post Advisor, contacted Lieutenant Robert Meader regarding allegations of misconduct by Plaintiff in his role as Advisor for the Explorer Posts, including allegations related to having Jason spend the

---

of standards for all adult volunteer leaders and for enforcing the policies of Boy Scouts of America. (Green Aff., ¶ 1.)

[5]     "A Chain of Command is established for the efficient operation of each post. . . . The Post Advisor is a police officer. . . ." (Amend. Compl., Exh. 3, at p. 5 (CPD Law Enforcement Post, Rules and Regulations ); Jackson J. Aff., ¶ 6.)

[6]     The Court has omitted the last names of the non-party Explorer members.

[7]     Plaintiff notes that Post Advisor for Post #222. Jason Jackson stated during his interview that he once provided a ride home for an Explorer, which Plaintiff indicates is a violation of the Explorer one-on-one rule.

night at his home. Wilkinson also relayed her concerns to Lt. Meader regarding information she obtained from another Explorer in Plaintiff's Post. Lt. Meader, in turn, contacted the Internal Affairs Bureau ("IAB") regarding the allegations of Plaintiff's misconduct. Sergeants Mark Rapp and Joseph Backman, both of IAB, conducted several interviews regarding the allegations against Plaintiff.

Sergeants Bachman and Rapp interviewed several CPD personnel and a majority of the Explorers. During her IAB interview, Wilkinson said that she had learned Jason had spent the night at Plaintiff's house in July, 2004, prior to the conference in Atlanta. Wilkinson observed Jason in the earl morning hours and Plaintiff's home, and Plaintiff told her Jason had spent the night. (Rapp. Aff., Exh. 1.) Rapp and Bachman interviewed Jason during their investigation. Jason denied that anything inappropriate occurred when he spent the night at Plaintiff's home.

Wilkinson also stated that another female Explorer, Stephanie, sought her out and told her about Plaintiff's conduct towards a friend at her school, Matt. Wilkinson described Stephanie's concern about Plaintiff's behavior towards Matt, which allegedly including Plaintiff tickling Matt, offering to rub his feet, sliding behind Matt on a couch, hugging him, and briefly holding him down before letting him up.[8] Wilkinson did not personally observe any of these incidents related to Matt, but learned of them during her conversation with Stephanie. (*Id.*)

---

[8]     Plaintiff contends that the evidence proved that Matt was not a member of the Explorer Post and was 18 years of age at the time of the alleged misconduct. (Mem. Opp. At p. 3.) The transcript of Matt's IAB interview reveals, however, that, although Matt was not an Explorer, Plaintiff met him at an Explorer-sponsored paint-ball event; Matt attended several Explorer social events; Plaintiff was attempting to recruit him into the Explorer program; Plaintiff took Matt on a ride-along in his police cruiser; and many of Matt's complaints of being uncomfortable related to physical contact Plaintiff made towards Matt while he was still seventeen. (Doc. 54-12 through 15.) Although Matt was not an Explorer, the record confirms that Plaintiff's contacts with Matt initially arose out of, and occurred only because of, his role as a Post Advisor.

The next day, on December 14, 2004, Defendant Meader removed Plaintiff as an Advisor for the Columbus Division of Police Law Enforcement Explorer Posts. Meader issued an order to Plaintiff commanding him not to have any contact with the Explorers:

> You are hereby ordered as of December 14, 2004 to (1) not have . . . any contact . . . with past members of the Columbus Division of Police, Explorers; (2) not cause any other persons to have contact with present or past members of the Columbus Division of Police, Explorers; (3) not to have contact with, or cause to have contact with any of the assistant advisors . . . . (4) not attend any police Explorer functions, official or otherwise, until otherwise notified by Robert Meader . . . .

(Amend. Compl., ¶ 48; Pl's Mem. Opp., Exh. J.)

On January 17, 2005, Meader sent an electronic message ("e-mail") to Plaintiff ordering him to bring all records and documents relating to his role with the Explorers. On January 25, 2005, Meader sent another e-mail giving Plaintiff a direct order to acknowledge the communication, and to coordinate with the duty supervisor to bring in all items related to the Explorers by January 28, 2005. Plaintiff acknowledged Meader's message, and forwarded the documents under protest because, according to Plaintiff, the paperwork had been created and maintained on his private time and was his personal property. Plaintiff could have, but did not, file a grievance concerning the orders.

On or about March 6, 2005, Plaintiff received a letter from the Boy Scouts of America, through Ronald S. Green, stating that they had "received information that has compelled us to revoke and/or deny any registration you may have in the Boy Scouts. We must therefore request that you sever any relationships you may have with the Boy Scouts of America, the Exploring and Learning for Life programs." (Frontera Dep., Exh. 4.) Plaintiff was notified that he could request a review by the Boy Scouts' regional review committee, but he did not seek a reexamination.

As a result of the initial IAB investigation, Bachman and Rapp ultimately made recommendations for nine "allegations" against Plaintiff: (1) "While acting as the Post Advisor for the Columbus Division of Police. . . [Plaintiff] engaged in misfeasance by allowing Explorer Jordan Mack to spend the night at his home"; (2) [Plaintiff] failed to Obey orders given to him by Division Supervisors"; (3) [Plaintiff] was insubordinate by failing to obey written orders issued by Division supervisors"; (4) "While acting as the Post Advisor . . . [Plaintiff] failed to Care for Division Property"; (5) "[Plaintiff] failed to notify his Chain of Command and request approval to work secondary employment not of a police nature"; (6) "[Plaintiff] failed to manage [the Post] by the Constitution and By, Laws, [sic] Rules and Regulations of the Columbus Division of Police Explorer Post"; (7) "[Plaintiff] engaged in conduct that is unbecoming as an officer of the Columbus Division of Police when he telephoned a witness and attempted to influence him regarding an interview with Internal Affairs"; (8) "[Plaintiff] was untruthful during the course of the investigation" and (9) "While acting as the Post Advisor for the Columbus Division of Police Explorer Post(s), [Plaintiff] engaged in acts of sexual harassment involving Explorer members." (Rapp Aff., Exh. 2) IAB Sgts. Rapp and Bachman recommended a finding of sustained for allegations one (1) through eight (8), but recommended a finding of "unfounded pursuant to Article 8.12" of the collective bargaining agreement ("CBA") for allegation nine (9).[9]

Pursuant to Division Directive 3.10, the officers in Plaintiff's chain of command reviewed and commented on the IAB recommendations. Although the officers in Plaintiff's chain of

---

[9]     Article 8.12 of the CBA requires that a citizen complaint filed after 60 days of the event must be classified as "unfounded" and the officer is not required to respond. (Rapp. Aff., Exh. 5.) Rapp and Bachman could not determine definitively when the behavior underlying the allegation actually occurred, and therefore classified it as unfounded, and did not include the nature of the conduct in the investigative summary.

command disagreed as to some of the allegations, the Deputy Director is the sole individual with final authority to make the decision as to whether an allegation should be sustained.[10] In this case, the Deputy Director determined that only allegation three (3), related to Plaintiff's insubordination, would be sustained. According to the Deputy Director, Plaintiff warranted a written reprimand for the insubordination charge, but, because it would have been issued outside the time permitted by the CBA, the reprimand was never placed in his personnel file. It is undisputed, therefore, that Plaintiff received absolutely no discipline as a result of this investigation.

On May 17, 2005, the IAB opened a separate investigation into whether Plaintiff had been insubordinate to his supervisors during the initial investigation by contacting Bryan Mason, one of the Explorers. Defendant Commander William Mattei relieved Plaintiff of his regular assignment pending further investigation into the insubordination charges and temporarily assigned him to Division Headquarters. The IAB subsequently determined that the allegations of

---

[10]     Plaintiff makes much of the fact that his sergeant, Sgt. Daniel Kane– the first to review the allegations from the IAB investigation in his chain of command– with the assistance of Sgt. Laura Suber, recommended that each of the allegations be designated as unfounded. Kane also noted that the Division of Police never screened or selected the Post Advisor but instead the position had been filled by a police officer with no supervisory input or approval. Kane also suggested that he was unclear as to how the Explorer program had been incorporated within the Columbus Division of Police, and that the Division "has not established a nexus between the Division and the Learning for Life Organization." (Doc. 58-23, Exh. K, "Kane Response.")

First, the Court notes that Kane's written review is in the form of an unauthenticated document, and not presented as proper evidence under Fed. R. Civ. P. 56. Nonetheless, in an attempt to understand Plaintiff's claims, the Court has thoroughly examined these and other unauthenticated documents contained in his Exhibits E, F, G, H and I. Second, even if the document was properly before the Court, it does nothing to support Plaintiff's claims that the City or its officials violated his constitutional rights. Kane had no responsibility or understanding of the Explorer program. Plaintiff also has not asserted, nor can a finding be made, that Kane had authority to speak for the City so as to establish some type of official policy or lack thereof, related to the Explorer program.

insubordination in this second report were unfounded, and the complaint was cleared. Plaintiff was not relieved of his gun or his badge, lost no pay or benefits, and continued to work all of his special-duty jobs. On June 29, 2005, Mattei reinstated Plaintiff to his regular assignment.

## II.

The procedure for considering whether summary judgment is appropriate is set forth in Federal Rule of Civil Procedure 56(c), which provides:

> The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

The evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. Kress & Co.*, 398 U.S. 144, 158-59 (1970). Summary judgment will not lie if the dispute about a material fact is genuine: "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Matsushita Electronic Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). The Court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133 (2000).

In responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'"

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476 (6th Cir. 1989) (quoting *Liberty Lobby*, 477

U.S. at 257). The nonmoving party must adduce more than a mere scintilla of evidence in order

to overcome the summary judgment motion. *Id.* It is not sufficient for the nonmoving party to

merely "'show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting

*Matsushita*, 475 U.S. at 586). The nonmoving party has an affirmative duty to direct the court's

attention to those specific portions of the record upon which it seeks to rely to create a genuine

issue of material fact.

### III.

Section 1983 provides in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or
usage, of any State or Territory or the District of Columbia, subjects, or causes to
be subjected, any citizen of the United States or other person within the jurisdiction
thereof to the deprivation of any rights, privileges, or immunities secured by the
Constitution and laws, shall be liable to the party injured in an action at law . . .
.

42 U.S.C. § 1983. Section 1983 itself creates no substantive rights, but merely provides a

mechanism for aggrieved persons to obtain a remedy for deprivations of rights established

elsewhere. *Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985). Section 1983 has two basic

requirements: (1) state action that (2) deprived an individual of federal statutory or constitutional

rights. *Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir. 1998); *United of Omaha Life Ins. Co. v.

Solomon*, 960 F.2d 31, 33 (6th Cir. 1992).

Defendant, the City of Columbus, as a municipality, may be held liable under § 1983 only

when the municipality itself causes the alleged constitutional violation. *Monell*, 436 U.S. at 694.

The doctrine of *respondeat superior* does not apply; a governmental entity cannot be held liable

under § 1983 based solely upon allegations that an employee or agent inflicted an injury. *Id.* at 691. "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694. The Sixth Circuit has held that "to satisfy the *Monell* requirements a plaintiff must identify the policy, connect the policy to the city itself and show that particular injury incurred because of the execution of that policy." *Garner v. Memphis Police Dept.*, 8 F.3d 358, 364 (6th Cir. 1993) (adopting the test articulated in *Bennett v. City of Siidell*, 728 F.2d 762, 767 (5th Cir. 1984)).

The local government's policy or custom "must be the moving force of the constitutional violation in order to establish the liability of a governmental body under § 1983." *Polk County v. Dodson*, 454 U.S. 312 (1981) (quoting *Monell*, 436 U.S. at 694). The course of conduct, "whether formally declared or informally accepted, must be the policy of the city government if it is to be the basis of city liability." *Bennett*, 728 F.2d at 767.

The City of Columbus seeks summary judgment on the basis that Plaintiff has failed to establish a violation of his constitutional rights. In particular, Defendants assert that Plaintiff's § 1983 claim fails as a matter of law because Plaintiff has not endured a constitutional deprivation and, even assuming a constitutional violation, he has not identified any City policy, custom or practice that could have caused it. Plaintiff counters that Meader's order prohibiting him from participating in the Explorer program violated his rights under the First Amendment. Plaintiff also contends that Meader's order violated his First Amendment rights because it attempted to stop him from communicating with his friends, including fellow-Explorer, Cliff Porter, and other police officers who participated in the Explorer program. He also maintains that Defendants' failure and

indifference to clarify the nexus between the Explorer Posts and the Police Division deprived him of due process.

### A. First Amendment

#### 1. Speech

Plaintiff asserts that he was "primarily a private citizen when he served as Post Advisor," and that "CPD policy, custom or practices that allow inappropriate exercise of control by CPD over the Explorer Posts deprived Plaintiff of his rights." (Mem. Opp., at p. 8.) He maintains that Lt. Meader's December 14, 2004 order commanding him not have any contact with past or present members of the Explorers or advisors and not attend any Explorer functions violated his First Amendment rights because it was vague and "over[-]broad because it prohibited both protected and unprotected speech." (*Id*.) Plaintiff also suggests that "the order was attempting to prohibit speech before it happened and such an order has a significantly higher burden of proving the legitimacy of its actions than it would if simply disciplining an employee after the speech occurs." (*Id*.) Plaintiff, however, cites to no authority to support these positions.[11]

State action "not intended to control the content of speech but incidentally limiting its unfettered exercise" is not forbidden by the First Amendment where "justified by subordinating valid governmental interests, a prerequisite to constitutionality which has necessarily involved a weighing of the governmental interest involved." *Id*. at 50-51. Here, Meader's order prohibiting Plaintiff from contacting present or past members of the Explorers clearly does not regulate the

---

[11]     Plaintiff, in fact, cites to virtually no authority in his entire Memorandum in Opposition. Again, the Court has viewed the evidence in a light most favorable to Plaintiff, and has, in fact, in an abundance of caution, reviewed evidence that is not even properly presented under Rule of Civil Procedure 56. Defendants, however, have met their burden of showing an absence of evidence to support Plaintiff's case.

content of speech. Meader's order that Plaintiff not speak to current or former Explorers was issued on the same day that the Internal Affairs' investigators began interviewing witnesses, including a number of employees. A governmental entity which is investigating a complaint against an employee has an interest in a thorough and fair investigation, including a concern that witnesses not speak to each other before interviews occurred. Meader's order does not have an expiration date but was clearly directed at the investigation about to begin. No action was taken against Plaintiff for any alleged violation of the order.

Plaintiff contends that the order prevented him from associating with a friend, Cliff Porter, who was a member of the Explorers. The Court is not prepared to conclude that an order issued to a police officer under investigation for misconduct involving youths under his tutelage has a constitutional right to associate with such persons, particularly while the investigation was ongoing. While such order here should have had an expiration, there is no claim that Plaintiff sought a termination or modification of the directive once the investigation ended.

Further, Plaintiff contends that, as to the Explorers, he was a private citizen, not a public employee. Plaintiff's conduct may have occurred while he was off-duty, but it was inextricably associated with his public employment with the City of Columbus. Plaintiff could only have served as a Post Advisor to the Explorers because he was a police officer. And, his speech as it related to the Explorers, does not impact a matter of public interest. Thus, when a public employee's expression does not relate to any matter of political, social, or other concern to the community, "government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Akers v. McGinnis*, 352 F.3d 1030, 1037-38 (6th Cir. 2003.) "Federal courts normally do not review personnel decisions

reacting to an employee's behavior when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters of only personal interest." *Jackson v. Leighton,* 168 F.3d 903, 909-10 (6th Cir.1999)(internal citations omitted).

Here, there is no evidence from which a reasonable jury could return a verdict in favor of Plaintiff on a claim that Defendants violated his First Amendment right to freedom of speech. Defendants are, therefore, entitled to judgment as a matter of law on this aspect of Plaintiff's case.

### 2.    Association

As the Court understands his position, Plaintiff contends that Defendants violated his First Amendment associational rights because Lt. Meader's order was overly-broad, and prohibited him from associating as a private citizen with members and advisors of the Explorer Post.    The First Amendment right of association extends to two aspects of protected activity:

> [C]hoices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty. In another set of decisions, the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment– speech, assembly, petition for the redress of grievances, and the exercise of religion. The Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties.

*Roberts v. United States Jaycees,* 468 U.S. 609, 617-18 (1984).

The first of these two expressions, the "freedom of intimate association," extends to various aspects of individual liberty guaranteed by the Bill of Rights. This branch of the freedom of association affords protections to the most personal of associations, such as marriage and preserves "certain kinds of highly personal relationships a substantial measure of sanctuary from unjustified interference by the State." *Id.* at 618. Plaintiff has not cited any cases, and indeed the

Court cannot find a cognizable basis, from which to determine that his association with the Explorer Post or his friendship with Cliff Porter was the sort of "intimate human relationship[]" referred to in *Roberts* that the Constitution was designed to protect.

Similarly, Plaintiff cites to no legal authorities which have found a constitutional right of association as it relates to continued participation in a police-sponsored volunteer-based Explorer program, or to associate on a social level with the members and advisors of the Post, when such organization has expelled him from participation. Moreover, Plaintiff has not cited to any cases in the absence of a protected class or activity in which a volunteer, non-profit organization must associate with a person the organization has elected to exclude. While the Boy Scouts and the Division, as the host organization, no doubt could permissibly expel Plaintiff from its volunteer-based program because "[t]he forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints," *Boy Scouts of America v. Dale*, 530 U.S. 640, 648 (2000), Plaintiff has failed to point to authority for the proposition that he has an absolute right to continued association with the group.[12] Defendants are, accordingly, entitled to judgment as a matter of law on Plaintiff's First Amendment claim under § 1983.

## B.    Fourteenth Amendment

Plaintiff asserts that Defendants' orders directed at him "to submit all records related to the Explorers Posts or face further investigations and allegations of insubordination," violated his

---

[12]    This case does not, as in *Board of Directors of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537 (1987), present a question involving access to public accommodations. *Rotary Club* stands for the proposition that civil rights statutes that seek to eradicate invidious discrimination by private clubs in their membership do not unduly infringe club members' associational rights in view of the compelling state interest in eliminating discrimination against members of a protected class and in assuring them equal access to public accommodations. Plaintiff herein makes no such claim.

rights under the Fourteenth Amendment. (Am. Compl., ¶ 103.) Plaintiff maintains that he holds a constitutional property right to any records created by him as a private citizen during his personal time, "including any records created to assist him in his capacity as a volunteer adult leader of the Explorer Posts." (Amend. Compl., ¶ 105.) He contends that Defendants' actions infringed upon his right to retain personal property and deprived him of his personal property without due process.[13] Plaintiff, however, has not demonstrated that the held a personal, protected property interest in the Explorer records, even if he created them while he was off duty. His former status with the Explorers was possible only by his employment with the Division of Police and the program was designed around the operation of the police department. He has not demonstrated the existence of a property interest to which due-process component of the Fourteenth Amendment could have attached. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985)(holding that procedural due process claim requires plaintiff to prove existence of a property interest and inadequacy of state remedies).

Plaintiff also maintains that he had a constitutional-protected property interest in his job and regular assignment as a Columbus Police officer by virtue of the CBA. While this may be true, it is undisputed that Plaintiff was never suspended, discharged or disciplined. He maintained

---

[13]     Plaintiff appears to address these allegations in the context of an alleged Fourth Amendment violation. As mentioned previously, however, Plaintiff did not plead a violation of the Fourth Amendment. Moreover, Plaintiff has not adduced evidence that he manifested a "subjective expectation of privacy" in the Explorer documents that Lt. Meader ordered him to return. *See California v. Ciraolo*, 476 U.S. 207, 211 (1986) (citing *Katz v. United States*, 389 U.S. 347 (1967)). The Fourth Amendment does not protect a merely subjective expectation of privacy, but only those expectations that society is prepared to recognize as reasonable. *Oliver v. United States*, 466 U.S. 170, 177 (1984). Further, Plaintiff has not alleged that Defendants searched or seized these documents; he testified that he provided the documents himself, albeit under protest. This case simply does not present facts that could support a Fourth Amendment claim.

his badge and his weapon. He was not deprived of his property interest in his job. A temporary, six-week transfer to Division Headquarters, without change in pay or benefits, did not amount to a materially adverse job action. Plaintiff states in passing that he need not show adverse job action, but instead is required to demonstrate merely that a reasonable person in the plaintiff's position would have been dissuaded from engaging in protected activity, citing *Burlington N'ern & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006). Plaintiff, however, has shown neither an actual adverse employment action or that a reasonable person would have been deterred from engaging in protected activity. Moreover, for that matter, Plaintiff has failed to articulate an argument that the employment-discrimination framework, as analyzed in *Burlington*, relates to his Fourteenth Amendment due-process claim under § 1983.

Plaintiff contends that he was deprived of his due process rights by the policy that allowed "inconsistent application by [Columbus Division of Police] IAB investigators of Article 8.12 of the Agreement between City of Columbus and Fraternal Order of Police." (Mem. Opp., at p. 10-11.) Article 8.12 of the CBA relates to processing complaints against a police officer. Article 8.12 requires that citizen complaints be received by the City in writing or reduced to writing within 60 days of the alleged event giving rise to the complaint. Plaintiff notes that, although one of allegations, relating to alleged sexual harassment against Explorers, was dismissed under the terms of Article 8.12, the first allegation relating to having another Explorer spending the night with him was not, even though the alleged incident occurred more than 60 days prior to the complaint. This timeliness provision, however, relates to citizen complaints, and does not apply to the type of internal-Division complaint first alleged by Officer Wilkinson as another member of Division personnel. (Rapp Aff., ¶ 11; Exh. 5.) Moreover, to the extent Plaintiff complains that

he did not receive any procedural due process with regards to the IAB investigations against him, he has failed to demonstrate the City's procedures were in any way constitutionally inadequate. Plaintiff could have filed a grievance over the application of Article 8.12 or any of the orders given to him by Lt. Meader under the express terms of the CBA. (Rapp Aff., Exh. 5.) Plaintiff did not avail himself to this process.

Finally, the Court likewise cannot find that Defendants violated Plaintiff's rights under the Fourteenth Amendment related to his removal as an Explorer Advisor. Plaintiff asserts that "Defendants' failure and indifference to clarify the nexus between the Explorer Posts and CPD deprived Plaintiff of due process. The appropriate procedure for removing Plaintiff as Associate Advisor would have been for a concerned person to contact the Post Advisor or Learning for Life, which is what eventually occurred." (Pl's Mem. Opp., at p. 11.) Plaintiff does not contend that he could not be removed as Associate Advisor; he maintains instead that the Columbus Division of Police no authority to remove him as Associate Post Advisor. Plaintiff is factually mistaken. The undisputed evidence of record demonstrates that either Learning for Life or the Division, as the host organization, could remove him. (Green Aff., ¶ 4.) The Court can glean no constitutional deprivation under the Fourteenth Amendment arising from this split authority to remove a leader.

Plaintiff makes a fleeting equal protection argument that Defendants treated him more harshly than Jason Jackson, Post Advisor for Post #222, who purportedly violated the one-on-one rule by giving an Explorer a ride home. The Equal Protection Clause prohibits a state from denying to "any person within its jurisdiction the equal protection of the laws." U.S. Const. Am. XIV, § 1. The Clause embodies the principle that all persons *similarly situated* should be treated

alike. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). At bottom, the threshold element of an equal protection claim is disparate treatment. Here, Plaintiff has failed to adduce evidence of discriminatory treatment on the part of the City of Columbus, and, more elementary, that he, who had an Explorer spend the night at his home, and Jason Jackson, who gave a ride to a stranded Explorer, are similarly situated.

Plaintiff has failed to demonstrate that a genuine issue of material fact remains for trial with respect to his Fourteenth Amendment claim under § 1983. Defendants are, therefore, entitled to summary judgment.

### C.    Policy, Custom or Practice

Even if he had established a deprivation of a protected right, Plaintiff has failed to identify any official policy or custom of the City of Columbus that resulted in a constitutional violation. Generally, Plaintiff asserts that he is under no duty to identify a specific written policy but that, in this case, Defendants' informal policies and practices deprived him of his constitutional rights under the First and Fourteenth Amendments. In full, Plaintiff says that the following informal policies, customs and practices deprived him of his constitutional rights under the First and Fourteenth Amendment:

- CPD policy, custom or practices that allow inappropriate exercise of control by CPD over the Explorer Posts,

- CPD policy, custom or practices that allow inconsistent application by CPD IAB investigators of Article 8.12 of the Agreement between City of Columbus and Fraternal Order of Police, Capital City Lodge No. 9, effective date December 9, 2002 – December 8, 2005.

- CPD policy, custom or practices that allow for a chain of command structure that encourages multiple policymakers,

- CPD policy, custom or practices that allow IAB investigators to expand the

-18-

scope of an investigation without receiving written authority,

- CPD policy, custom or practices that fail to train IAB investigators, especially with regard to the constitutional rights of the individual being investigated, and

- CPD policy, custom or practices that fail to train CPD personnel to appropriately address questions and concerns related to communication protocols, program operations or any other issues related to the Explorer Posts.

Plaintiff correctly states that he is not required to identify a specific written policy. An act performed pursuant to a "custom" not formally approved by an appropriate decision maker, may subject a government entity to liability on the theory that the relevant practice is so widespread as to have the force of law. *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 404 (1997). The fact that Plaintiff need not cite to an officially executed policy, however, does not relieve him from his obligation to adduce *specific facts* that the government had a widespread-informal policy that caused a constitutional violation.[14]

In this case, the Court finds that Plaintiff has not set forth specific *facts* to support a finding that a City policy, custom or practice led to the alleged constitutional violations. He has merely provided conclusory allegations and opinions that the City has certain customs. First, the record

---

[14]     Fed. R. Civ. P. 56(e) provides that, in responding to a motion for summary judgment:

[A]n opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must--by affidavits or as otherwise provided in this rule--set out *specific facts* showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

*Id.* (emphasis added). Rule 56(c) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

does not support the supposition that the Columbus Police Division inappropriately exercises control over its own Explorer Posts. To the contrary, record evidence demonstrates that either the Boy Scouts or the sponsoring organization– in this case, the Columbus Division of Police– may remove an adult volunteer at any time with or without cause. Lt. Meader testified that he had authority over the administrative operations of the Explorer Post by virtue of his position within the training bureau. Further, although Plaintiff complains of policies that encourage IAB investigators to expand their investigations and inspire multiple policy-makers, he has adduced no actual evidence of such policies beyond his mere supposition that they exist.

Second, as to his claim for failure to train, Plaintiff can establish liability "[o]nly where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989). Allegations that a particular officer was improperly trained are insufficient to prove liability. *Id.* Plaintiff has adduced absolutely no evidence that the City failed to train investigators within the Internal Affairs Unit with regard to investigative techniques. He likewise has neither argued nor pointed to anything in the record that would demonstrate that the City was deliberately indifferent to his constitutional rights.

### IV.

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. #54) is **GRANTED.** The Clerk is directed to enter judgment in favor of Defendants.

**IT IS SO ORDERED.**

12-23-2008
_____
**DATED**

_____
**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**